IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

TEDDY DWIGHT COPLEY,

     Plaintiff,

v.                            CASE NO. 2:10-cv-00809

MICHAEL J. ASTRUE,
Commissioner of Social Security,

     Defendant.


### M E M O R A N D U M    O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. Both parties have consented in writing to a decision by the United States Magistrate Judge.

Plaintiff, Teddy Dwight Copley (hereinafter referred to as "Claimant"), filed an application for DIB on June 12, 2007, alleging disability as of August 1, 2001, due to post traumatic stress disorder [PTSD], hearing loss, high cholesterol, back problems, lung problems, and depression. (Tr. at 11, 103-07, 129-36, 170-76, 180-86.) The claim was denied initially and upon reconsideration. (Tr. at 11, 55-59, 64-66.) On March 27, 2008, Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 67-68.) The hearing was held on November 19, 2008 before the Honorable Theodore Burock. (Tr. at 22-52, 74.) By

decision dated February 17, 2009, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 11-21.)  The ALJ's decision became the final decision of the Commissioner on April 9, 2010, when the Appeals Council denied Claimant's request for review. (Tr. at 1-5.)  On June 9, 2010, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. § 404.1520 (2002).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. § 404.1520(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. § 404.1520(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  Id. § 404.1520(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to

2

Subpart P of the Administrative Regulations No. 4. <u>Id.</u> §
404.1520(d). If it does, the claimant is found disabled and
awarded benefits. <u>Id.</u> If it does not, the fourth inquiry is
whether the claimant's impairments prevent the performance of past
relevant work. <u>Id.</u> §§ 404.1520(e). By satisfying inquiry four,
the claimant establishes a <u>prima facie</u> case of disability. <u>Hall v.
Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts
to the Commissioner, <u>McLain v. Schweiker</u>, 715 F.2d 866, 868-69 (4th
Cir. 1983), and leads to the fifth and final inquiry: whether the
claimant is able to perform other forms of substantial gainful
activity, considering claimant's remaining physical and mental
capacities and claimant's age, education and prior work experience.
20 C.F.R. § 404.1520(f) (2002). The Commissioner must show two
things: (1) that the claimant, considering claimant's age,
education, work experience, skills and physical shortcomings, has
the capacity to perform an alternative job, and (2) that this
specific job exists in the national economy. <u>McLamore v.
Weinberger</u>, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant
satisfied the first inquiry because he has not engaged in
substantial gainful activity since the alleged onset date. (Tr. at
13.) Under the second inquiry, the ALJ found that Claimant suffers
from the severe impairments of post traumatic stress disorder and
hearing impairment. (Tr. at 13-14.) At the third inquiry, the ALJ

concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1.  (Tr. at 14-15.) The ALJ then found that Claimant has a residual functional capacity for a full range of work at all exertional levels, reduced by nonexertional limitations.  (Tr. at 15-19.)  As a result, Claimant was unable to perform any past relevant work.   (Tr. at 19.) Nevertheless, the ALJ concluded that Claimant could perform jobs such as cleaning, hand packing, and night stocking, which exist in significant numbers in the national economy.  (Tr. at 20.)  On this basis, benefits were denied.  (Tr. at 21.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.   In <u>Blalock v. Richardson</u>, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not

abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was 58 years old at the time of the administrative hearing. (Tr. at 27, 29.) He completed the ninth grade, entered the Jobs Corps, and obtained a General Equivalency Diploma [GED]. (Tr. at 29, 278-79.) He was drafted into the Army in August 1969 and was honorably discharged in March 1971. (Tr. at 278.) In the past, he worked at a service station, as a coal miner utility man, and in various capacities at his wife's restaurant. (Tr. at 30, 33, 41, 279.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it below.[1]

Physical Evidence

On May 1, 2000, a "Physician's Report of Occupational Pneumoconiosis [OP]" was completed for the Worker's Compensation Fund by a physician who's signature is illegible. (Tr. at 201-02.)

_____

[1] Although additional evidence is summarized, August 1, 2001 is the alleged onset date and December 31, 2005 is the date last insured.

5

On the form, the physician has checked the box marked "YES" regarding the question:  In your opinion has claimant contracted OP?  (Tr. at 201.)

On September 12, 2000, the OP Board, comprised of James H. Walker, M.D., Jack L. Kinder, M.D., and Johnsey L. Leef, Jr., M.D., made these findings regarding Claimant:

> We have reviewed the record...and cannot make a diagnosis of OP.  The evidence includes a history that this 50 year old Coal Miner/Utility Man has been exposed to a dust hazard for approximately 25 years...
>
> A careful review of the claimant's medical record reveals that he ceased work in July 1999 due to layoff...
>
> Physical examination shows the claimant to be in fair general clinical condition.  He is not in any respiratory distress at rest.  Chest cage is well formed.  There are no rales or wheezing present.  Heart sounds are of good quality with no murmurs.  Exercise tolerance test was not given due to painful back.
>
> X-RAY INTERPRETATION: CHEST PA views of the chest show INSUFFICIENT pleural or parenchymal changes to establish a diagnosis of OP.

(Tr. at 195.)

On February 13, 2000, Mohammed Ranavaya, M.D. completed a "Report of Occupational Hearing Loss" form for the West Virginia Workers' Compensation Division regarding Claimant.  (Tr. at 203-04.)  Dr. Ranavaya diagnosed: "Bilateral noise induced hearing loss."  (Tr. at 204.)

Records indicate Claimant received treatment approximately 32 times at the Huntington Veteran's Administration Medical Center ["VAMC"] from August 31, 2000 to August 20, 2008.  (Tr. at 277-

6

375.)    The first twenty-five pages of these medical records cover ten visits after the date last insured, nine visits involve Claimant's mental health outpatient treatment.  (Tr. at 277-302.) The other record is for a primary care health visit dated March 24, 2006, wherein Claimant states his pain level to be "0".  (Tr. at 295.)  Manolo D. Tampoya, M.D. wrote: "pt [patient] came in doing well but had problems w/ [with] cholesterol pills w/ muscle aches and pains...LUNGS: No rales or wheezes."  Id.  It is noted that there is no discussion of back problems or pain.  Id.

The last twenty-three pages of these medical records cover office visits prior to the alleged onset date of August 1, 2001. (Tr. at 362-75.)  A note dated August 31, 2000 states: "50 year old wm [white male] here to [have] his rx [prescription] filled. Follows with Dr. Toparis at LGH [Logan General Hospital].  H/O [history of] GERD stable with Prilosec."  (Tr. at 370.)  It is noted that there is no discussion of back problems or back pain. (Tr. at 362-75.)  A note dated May 15, 2001 indicates: "This is the initial visit for this 51 year old Veteran who [is] here for his initial check up and assessment.  He is healthy, except for hx [history] of GERD [gastroesophageal reflux disease].  He is taking Prilosec 20 mg/d...He does smoke.  He occasionally drinks alcohol. He has no specific complaints today."  (Tr. at 363.)

The pertinent records from the Huntington VAMC are dated from August 21, 2001 to December 19, 2005.  (Tr. at 303-61.)  Again,

7

many of these records deal with Claimant's treatment as a mental health outpatient. Id.  The exceptions are as follows:

On August 21, 2001, Harry D. Fortner, M.D. noted that Claimant's pain score is "0" and "doing good except for a constant over acid stomach...advised that smoking makes him produce more stomach acid...chest clear." (Tr. at 360.)

On March 5, 2002, Dr. Fortner noted that Claimant's pain score was "0" and "He is doing better on Aciphex for his reflux and he is feeling good...He does not have any other new complaints...v.s. [vital signs] good, the lungs clear, heart regular." (Tr. at 356.)

On April 1, 2003, Faredoon K. Misaghi, D.O. notes that Claimant has a pain score of "0" and "voices no complaints...pt advised to stop smoking.  Smoking cessation class offered - refused...Depression screen was negative." (Tr. at 348-49.)

On October 22, 2003, Dr. Misaghi notes that Claimant has a pain score of "0" and a "lesion noted in lower lip left side, crusted, nodular...refer to plastics." (Tr. at 345-46.)

On November 12, 2003, Richard Santostefano, PA-C [physician's assistant-certified] states that Claimant is "not sure" if he handled Agent Orange in Vietnam "but thinks so" and does recall being in an area sprayed with Agent Orange. (Tr. at 340.)  Mr. Santostefano in his assessment states "none" regarding "conditions POSSIBLY RELATED to Agent Orange exposure." (Tr. at 343.)  It is further noted that Claimant has declined referral to smoking

8

cessation class.  (Tr. at 345.)

On December 1, 2003, Ghassan Moufarrege, M.D., Huntington VAMC, diagnosed Claimant with a squamous cell of the lower lip. (Tr. at 336.)  On January 22, 2004, William M. Cocke, Jr. M.D., plastic surgeon, performed excisional biopsy surgery at the Huntington VAMC for the lesion on his left lower lip.  (Tr. at 317-40.)  On January 28, 2004, Dr. Cocke stated: "Pt status post exc. lesion of the lower lip.  Sutures out.  Healing well.  Routine follow up next month."  (Tr. at 318.)

On July 7, 2004, Dr. Tamoya noted that Claimant's pain is "0" and "smokes 1 pack/day, 3-4 beer/day...LUNGS: No rales or wheezes...IMPRESSIONS: GERD, hyperlipidemia, allergic rhinitis." (Tr. at 314-15.)

On December 17, 2004, Dr. Tampoya noted that Claimant's pain is "0" and "pt came in doing well, had problem with Zocor w/ nightmares...LUNGS: No rales or wheezes."  (Tr. at 311-12.)

On August 3, 2005, Dr. Tampoya noted that Claimant's pain is "0" and "pt walked in c/o [complaining of] tiredness and tingling of left hand w/c [which] he attributes to the cholesterol pills." (Tr. at 309.)

On October 24, 2005, Dr. Tampoya noted  that Claimant's pain is "0" and "pt came in doing well, has had bad side effects from all cholesterol pills taken and does not want to take them anymore."  (Tr. at 304.)

Medical records indicate Claimant received general medical treatment from Jon Miller, D.O. on six occasions from August 30, 2006 to September 25, 2007.  (Tr. at 219-53.)

On August 30, 2006, Dr. Miller noted: "Seen as a new patient to get established with the practice...Complains that Prilosec is not helping with GERD...MUSCULOSKELETAL: No muscle or joint weakness, weakness, stiffness, swelling or inflammation.  No restriction of motion, cramping, or atrophy."  (Tr. at 219.)

On May 15, 2007, Claimant complained of his left jaw being "tingly" and Dr. Miller ordered x-rays which showed: "Five views...No fracture or osseous destructive process is identified." (Tr. at 237, 241.)

On August 29, 2007, Claimant complained of low back pain and Dr. Miller ordered an MRI of the lumbar spine which was reviewed on September 12, 2007 by Marsha Anderson, M.D.. (Tr. at 247, 252-53.) Dr. Anderson's impression: "Herniated disc at L4-5, L5-S1.  There is some moderate spinal stenosis at both of these levels." (Tr. at 253.)

On August 27, 2007, a State agency medical source completed an evaluation of Claimant's Physical Residual Functional Capacity ["PRFC"] assessment for the time period of his date last insured [DLI] of December 31, 2005.  (Tr. at 162-69.)  The evaluator, Joseph Beha, M.D., opined that Claimant's primary diagnosis is hyperlipidemia and the secondary diagnosis, gastroesophageal reflux

10

disease [GERD].   (Tr. at 162.) Dr. Beha concluded:

> There is insufficient MER [medical evidence of record]
> prior to DLI of 12/31/05 to assess severity.  While we
> know he had some problems per the notes at the VA, we
> don't know anything about his hearing, we have no labs to
> indicate severity of his hyperlipidemia at that time, we
> have no ROM or neuro findings to assess severity of back
> problems and his lung exams failed to reveal anything
> significant.

(Tr. at 169.)

On March 6, 2008, A. Rafael Gomez, M.D. stated:  "I have reviewed all the evidence in file and the PRFC of 08/27/07 is affirmed as written."  (Tr. at 275.)

Records indicate Claimant received treatment approximately 32 times at the Huntington Veteran's Administration Medical Center ["VAMC"] from August 31, 2000 to August 20, 2008.  (Tr. at 277-375.)   Many of these medical records involve Claimant's mental health outpatient treatment (see summary in Psychiatric Evidence section).  Id.

Psychiatric Evidence

Records indicate Claimant received services at the Logan Vet Center Outstation from August 2, 2000 to March 23, 2006 on approximately thirty occasions.  (Tr. at 254-74.)  Handwritten notations indicate "attendance at Huntington VAMC PCT-PTSD [post traumatic stress disorder] 6 week program...close case...Client refused to receive or participate in further services....Resistant to treatment; Minimal participation...The severity and chronicity of client's symptoms suggest a poor prognosis...Dual diagnosis.  No

substance tx [treatment]." (Tr. at 254-74, 259-261.)   On March 21, 2005, Jim Cockerham, M.S., counselor at the Vet Center, Logan Outstation, completed a Veterans Trauma Questionnaire and found Claimant had severe PTSD. (Tr. at 267.) On December 14, 2005, Mr. Cockerham noted that Claimant "Expresses no desire for tx [treatment]...Benefits oriented. Stable. In control at present, however, addition makes him fragile for relapse." (Tr. at 260.) Additional notations dated March 31, 2006, June 19, 2007, October 23, 2007, and February 26, 2008 again note "case closed." (Tr. at 254.)

Records indicate Claimant underwent a six-week PTSD Psychoeducational Group series with Linda G. Pennington, Psy.D., Clinical Psychologist, and Robert Huwieler, Ph.D., Clinical Psychologist, at the Huntington VAMC from January 24, 2006 to February 28, 2006. (Tr. at 299-302.)   Notes dated January 24, 2006, January 31, 2006, February 14, 2006, and February 21, 2006 indicate:

> This gentleman was appropriate in group, attentive to group content and process, and appeared to have no problems or conflicts related to the focus or process of this group. Cognitive functioning was sufficient for the tasks of this group. Affect was appropriate. There was no indication of psychosis or acute dangerousness to self or others.

(Tr. at 300-302.)

On February 28, 2006, Ms. Pennington noted:

The veteran was seen today for the 6th and final meeting of the PCT's PTSD Psychoeducational Group series...

12

> This gentleman was quiet but attentive to group content and process. He made appropriate contributions to the group discussion. There was no indication of problems or conflicts related to the focus or process of this group. Affect was appropriate. There was no indication of psychosis or acute dangerousness to self or others.
>
> His case will be staffed and he will be scheduled for ongoing treatment per recommendation from the team.

(Tr. at 299.)

On April 1, 2006, Mr. Cockerham, counselor at the Logan Vet Center Outstation, indicated that Claimant was drafted in 1969 and served 15 months in Vietnam:

> He served with infantry units as a supplyman at Cam Rahn Bay and various other locations in Vietnam...
>
> Veteran was referred to Huntington VAMC for medication assessment and substance abuse issues. He steadily consumed ETOH [alcohol] since military discharge and meets criteria for ETOH Dependance. Other evaluation tools seem to indicate he fits criteria for PTSD. He complained of anger, isolation, depression, anxiety, and panic attacks - all beginning in Vietnam.

(Tr. at 255-258.)

On August 28, 2007, a State agency medical source completed a Psychiatric Review Technique form ["PRTF"] assessing Claimant from the time period July 1, 1996 to December 31, 2005, the date last insured. (Tr. at 205-18.) The evaluator, Jeff Harlow, Ph.D., concluded: "Given that there isn't any ADL [activities of daily living] data during the adjudication period, the claim is assessed as 'Insufficient Evidence'." (Tr. at 217.)

On March 8, 2008, James Binder, M.D. stated in a case analysis report: "I have reviewed all the evidence in file and the 8/28/2007

PRTF with a DLI [date last insured] of 12/31/2005 is hereby affirmed as written." (Tr. at 276.)

On August 20, 2008, the Huntington VAMC referred Claimant for an "Initial PTSD Examination" wherein Roslyn E. Feierstein, Ph.D., Licensed Clinical Psychologist, determined that Claimant's diagnosis to be:

```
Axis I:    Primary - PTSD, chronic and prolonged;
           Secondary - Major Depression, recurrent,
           moderate with no psychosis; Alcohol Abuse,
           NOS; Panic Attacks with Agoraphobia.
II.        V71.09   No Diagnosis
III:       GERD, Hyperlipidemia, lumbar pain, ulcers,
           stenosis and allergic rhinitis
IV.        Combat Exposure and re-experiencing trauma
V.         GAF (current) = 48...
```

There is no other, independent psychiatric condition contributing to this Veteran's functional impairment. Prognosis is assessed to be guarded without further treatment...

The Veteran is considered "competent" for VA benefits purposes...

EMPLOYABILITY: His agoraphobia, reclusiveness, aggressiveness, intolerance for being around other individuals and the presence of chronic PTSD symptomatology renders him unemployable. He is not able to work at this time, even partially - whether sedentary or physical as evidenced by previous attempts to work since his early retirement; and with the problems he had on the job over 27 years. His symptoms have become more static and unchanging and are worsening in the past few years. When working in the coal business (27 years) he generally worked alone for the most part. Infrequent interactions typically led to verbal altercations.

CONCLUSIONS: The veteran's present examination has increased over the years, with aging, loss of family and friends, worsening health his PTSD symptomatology has worsened in both frequency and intensity. This evolution was gradual at first and has become increasingly more

14

apparent in recent years.  His treatment has been somewhat unsuccessful due to side effects from medication and inability to attend group treatment due to financial constraints and travel.

(Tr. at 287-88.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) the ALJ failed to appropriately label Claimant's back problems and the occupational pneumoconiosis ["OP"] as severe, and (2) the ALJ failed to reconcile his decision with the VE's testimony following Claimant's representative's additional limitations to the hypothetical and Dr. Feierstein's opinion that Claimant was unemployable due to his chronic PTSD symptoms. (Pl.'s Br. at 6-8.)

The Commissioner responds that (1) the ALJ's assessment of Claimant's RFC is correct because the record supports that the Claimant did not have a severe back impairment or OP prior to the expiration of his insured status on December 31, 2005, and (2) the ALJ properly complied with the Regulations in evaluating the medical source opinions and the VE identified a significant number of jobs that Claimant could perform despite the limitations on social interaction and noise. (Def.'s Br. at 9-16.)

Severe Impairments Prior to December 31, 2005

Claimant first argues that the ALJ erred in failing to find his back problems and OP to be severe. (Pl.'s Br. at 6-7.) Specifically, Claimant asserts:

> Despite acknowledging in the decision at page 4 of 11 itself that the MRI of September 12, 2007, demonstrated herniated discs with associated moderate spinal stenosis, apparently simply because there was no such objective evidence prior to then he failed to include it as a severe impairment. This is despite the fact that the Plaintiff's clear testimony on pages 30-31 of the transcript that he had such problems prior to 2005 and that he even took Motrin for his back before 2005. Simply that there was no objective evidence showing those back problems before 2005 does not mean that the Plaintiff did not have them particularly when his testimony is consistent with what was later verified by objective MRI testing.
>
> Similarly, as to the Plaintiff's OP (i.e. "Black Lung"), the Plaintiff testified very clearly that he has shortness of breath issues and is even limited in the amount of distance he can walk but apparently the ALJ citing evidence from 2000 felt as though that was not justified.

Id.

The Commissioner argues that the ALJ's assessment of Claimant's RFC is correct because the record supports that the Claimant did not have a severe back impairment or OP prior to the expiration of his insured status on December 31, 2005. Specifically, the Commissioner asserts:

> Plaintiff admitted at the hearing that he had not sought any treatment for a back impairment prior to December 2005 (Tr. 31). The ALJ noted that although Plaintiff claimed at the hearing that his back pain was constant, Dr. Miller, who examined Plaintiff on August 30, 2006, noted "no muscle or joint weakness, weakness, stiffness, swelling or inflammation" (Tr. 16). The ALJ further noted that the VA Medical Center records prior to the expiration of Plaintiff's insured status consistently recorded Plaintiff's rating of his own pain as "0" (Tr. 17)...The record consistently refutes Plaintiff's testimony at the hearing regarding his alleged back pain. Therefore, the ALJ reasonably concluded that Plaintiff's testimony regarding his back pain prior to December 31,

2005, was not fully credible, and could not be relied upon to find a "severe" impairment that would have a significant affect on Plaintiff's ability to work.

Furthermore, in evaluating the credibility of Plaintiff's subjective complaints of back pain, the ALJ complied with the relevant regulations when he took into account the fact that Plaintiff told examining medical providers at the VA that he was working at his wife's restaurant during his alleged period of disability. See C.F.R. § 404.1529. The ALJ noted that although Plaintiff claimed that he had not worked since August of 2001, he told a VA psychologist on April 21, 2005, that he had not worked at the bar during the hours that it was open since January 1, 2005, but that he cleaned the bar during closed hours (Tr. 16). The ALJ further noted that Plaintiff told the psychologist that he spent time cleaning the family restaurant for [sic] to five hours a day, five days a week during open hours (Tr. 16). The ALJ also noted that Plaintiff told the psychologist that he could not attend group sessions due to obligations in the family business (Tr. 16). The ALJ reasonably considered that the inconsistencies between Plaintiff's testimony at the hearing and his admissions to medical providers regarding the absence of pain and the degree of his involvement in his wife's restaurant, rendered his testimony regarding incapacitating pain unreliable and uncorroborated by any treatment for a back condition during the alleged period of disability.

There is also no merit to Plaintiff's claim that the ALJ's RFC was defective because it did not include a finding of severe impairment from pneumoconiosis (Pl.'s br. at 7). The evidence that Plaintiff submitted relevant to his claim for pneumoconiosis indicated that pulmonary function studies and an x-ray did not support a diagnosis of OP (Tr. 195-202). Although Plaintiff suggests that the ALJ should not rely upon this evidence because it was related to Plaintiff's worker's compensation claim of 2000, Plaintiff submitted no other evidence to support a claim of severe respiratory impairment. Moreover, although the VA records repeatedly noted that Plaintiff was a heavy smoker, and encouraged him to attend smoking cessation classes, there was no evidence in the VA records during the alleged period of disability that Plaintiff had a severe respiratory impairment (Tr. 254-335). Indeed, Plaintiff acknowledged at the hearing that he was not receiving, nor had he

received, medication for a respiratory impairment (Tr. 32). Therefore, this bald allegation of functional limitations from a severe respiratory impairment has no merit.

(Def.'s Br. at 11-13.)

Under current law, a severe impairment is one "which significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c) (2010); see also 20 C.F.R. § 404.1521(a) (2010); Bowen v. Yuckert, 482 U.S. 137, 140-41 (1987) (recognizing change in severity standard). "Basic work activities" refers to "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b) (2010). Examples of basic work activities are:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
> (6) Dealing with changes in a routine work setting.

Id.

At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity (RFC) for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996).

18

Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. § 404.1545(a) (2010). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

The RFC determination is an issue reserved to the Commissioner. See 20 C.F.R. § 404.1527(e)(2) (2010).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

Social Security Ruling 96-7p clarifies when the evaluation of symptoms, including pain, under 20 C.F.R. §§ 404.1529 and 416.929 requires a finding about the credibility of an individual's

19

statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements.  The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to:

    - The medical signs and laboratory findings;

    - Diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and

    - Statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

In an extensive eleven-page decision, the ALJ considered the entire record and made these findings regarding Claimant's severe impairments:

The claimant did not engage in substantial gainful employment during the period from his alleged onset date of August 1, 2001 through his date last insured of December 31, 2005...Through the date last insured, the claimant had the following severe impairments: post traumatic stress disorder and hearing impairment (20 CFR 404.1521 *et seq.*).

On March 21, 2005, Jim Cockerham, MA, completed a Veterans Trauma Questionnaire and found severe post traumatic stress disorder (Exhibit 5F at 14).

On February 13, 2001, Dr. Mohammed Ranavaya, MD, found bilateral noise induced hearing loss (Exhibit 2F).

Concerning the nonsevere impairments, there is mention of black lung, low back impairment, gastroesophageal reflux disorder ("GERD"), hyperlipidemia and alcohol abuse. To be a severe impairment the medical evidence must establish more than a slight abnormality or combination of slight abnormalities which would have more than a minimal effect on an individual's ability to work. The impairment must significantly limit a person's physical or mental ability to do basic work activities (SSR 85-28) for a continuous period of at least twelve months. The undersigned finds that the above named impairments are "not severe" (20 CFR §§ 404.1520(a) and (c) and 416.920(a) and (c) and SSR 96-3p) in that they cause no more than minimally vocationally limitations.

The record mentions a history of pneumoconiosis/black lung. An x-ray dated May 16, 2000, demonstrated pneumoconiosis category 1/0, chest otherwise unremarkable. On September 12, 2000, Dr. James Walker, MD, chairman of the occupational pneumoconiosis board noted the X-ray showed insufficient pleural or parenchymal changes to establish a diagnosis of occupational pneumoconiosis. Pulmonary function studies dated September 12, 2000, were within normal limits (Exhibit 1F). The undersigned finds that the black lung causes no more than minimal limitations and therefore is not severe.

The record mentions low back pain. A MRI dated September 12, 2007, demonstrated herniated disc at L4-5 and L5-S1 with some moderate spinal stenosis at both levels. The record prior to September 12, 2007, contains no objective evidence regarding back problems. In fact, on August 30,

2006, Dr. Jon Miller, DO, noted only GERD with regard to past medical history.  Dr. Miller's musculoskeletal assessment demonstrated no muscle or joint pain, weakness, stiffness, swelling or inflammation. He found no restriction of motion, cramping or atrophy.  The neurologic assessment indicated no difficulties in motor strength, gait, sensation (Exhibit 4F).  The claimant's last day insured is December 31, 2005.  The undersigned noted the claimant's low back problems did not arise until well after the claimant's last date insured.

The record notes a history of GERD, which is conservatively treated with Nexium (Exhibit 14E). Therefore the undersigned finds that this is a nonsevere impairment in that it does not cause more than minimal problems.

The record mentions high cholesterol and hyperlipidemia, which is conservatively treated with Tricor (Exhibit 14E).  The undersigned finds the hyperlipidemia causes no more than minimal limitations.

With regard to mental health, the record mentions a history of alcohol abuse.  The record noted that, although the claimant did not receive treatment, he was able to maintain sobriety for extended periods of time (Exhibit 5F).  The undersigned finds alcohol abuse to be nonsevere because it causes no more than minimal limitations.

(Tr. at 13-14.)

Regarding Claimant's residual functional capacity, the ALJ made these findings:

After a careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations:  the claimant can have only incidental public contact.  The claimant can have no close cooperation to achieve job tasks.  The claimant must avoid noisy work environment.

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective

22

medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p...

The claimant alleged PTSD, hearing loss, high cholesterol, back and lung problems. He noted he cannot lift at all. The claimant alleged not sleeping well, having mood swings and stays depressed all the time.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

The claimant alleged he has not worked since August 2001. At the hearing the claimant noted that from the time he was laid off, in 1999 until August 2001, he tried helping his wife run a restaurant. The claimant noted he washed dishes and made deliveries, but had problems doing this because he stayed irritated. However, on April 21, 2005, Jim Cocherham, MS, noted the claimant "has not worked at bar during open hours since January 1, 2005." Mr. Cocherham noted the claimant reportedly only cleans the bar during closed hours. Mr. Cocherham also noted the claimant spends time cleaning [the] family restaurant, four to five hours a day, five days per week during open hours. On December 14, 2005, Mr. Cocherham noted the claimant "cannot attend group due to obligations in family business" (Exhibit 5F). The undersigned noted the discrepancies between the claimant's testimony and the record raise serious doubt as to the claimant's credibility.

The claimant alleged back pain prior to December 2005. The claimant described the pain as "constant." However, as previously noted, on August 30, 2006, Dr. Miller noted "no muscle or joint pain, weakness, stiffness, swelling or inflammation." In fact, Dr. Miller does not note any complaints of back pain until September 26, 2006, at which time he ordered an MRI to evaluate the pain. The VA Medical Center records noted the claimant consistently rated his pain as "0" (Exhibit 8F)...

23

The claimant alleged shortness of breath started approximately 1997 or 1998. The claimant alleged receiving a five percent award (approximately $12,000) for pneumoconiosis. However, the record demonstrated that the OP Board could not make a diagnosis of OP (Exhibit 1F). A chest x-ray dated November 13, 2003, was "unremarkable." The claimant denied receiving breathing treatments, which would be expected if the lung disease was as severe as alleged...

The undersigned noted the multiple inconsistencies in the claimant's testimony and the record reflects poorly on the claimant's credibility. The undersigned finds that the claimant attempted to present himself as much more limited than he is in order to secure benefits. In fact, this belief is supported by a note dated December 14, 2005, in which Jim Cocherham, MS, noted, "Expresses no desire for treatment" and described the claimant as, "Benefits oriented" (Exhibit 5F at page 7).

(Tr. at 15-18.)

The court finds that substantial evidence supports the ALJ's assessment of Claimant's RFC; the Claimant did not have a severe back impairment or OP prior to the expiration of his insured status on December 31, 2005. The medical record refutes Claimant's hearing testimony regarding his alleged back pain, breathing problems, and claimed inability to work prior to the expiration of his insured status. Therefore, the ALJ reasonably concluded that Claimant's testimony was not fully credible, and could not be relied upon to find a severe back and/or lung impairment that would have a significant affect on his ability to work.

Medical Source Opinions and VE Testimony

Claimant next argues that the ALJ failed to reconcile his decision with the VE's testimony following Claimant's

24

representative's additional limitations to the hypothetical and Dr.
Feierstein's opinion that Claimant was unemployable due to his
chronic PTSD symptoms. (Pl.'s Br. at 6-8.)  Specifically, Claimant
asserts:

> As had already been pointed out, the VE based upon
> limitations previously mentioned found the Plaintiff was
> unable to return to either past relevant work or other
> work.  Yet, the ALJ as we now know would ultimately
> ignore that opinion by finding the Plaintiff lacking in
> credibility.  The key to this was finding that limiting
> the Plaintiff's prior counsel's additional limitations
> added on to the hypothetical, the ALJ rejected those
> additional restrictions due to his notion that there were
> no objective findings to support such restrictions.

> It is hard for the undersigned to understand the ALJ's
> thought process in this regard given the totality of the
> Plaintiff's testimony-particularly as it relates to its
> PTSD.  Again, the Plaintiff has been awarded a 70%
> service connection by the VA, thus attesting to a severe
> psychiatric problem.  Many of those problems as was
> accurately related by the Plaintiff involve social
> withdrawal and a very limited interaction with the public
> at large.

> Interestingly, the ALJ adduces the logical conclusion
> that the Plaintiff would be able to interact
> appropriately in employment settings and perform
> substantial gainful employment, because he was able to
> participate appropriately in group therapy sessions at
> the VA Medical Center.  With all due respect, dealing
> with a group therapy session is quite different than
> dealing with the public at large.  First and foremost is
> the obvious, which is that in group therapy the Plaintiff
> is paired with other people similarly affected.
> Comparably, in terms of public interaction, we cannot
> assume that the people he will be dealing with are
> similarly as inflicted with the psychiatric condition.
> Further, the group therapy sessions to which the ALJ
> refers to were after the date last insured.

> Actually, Dr. Roslyn Feierstein, Ph.D., of VA Medical
> Center opined that the Plaintiff was unemployable due to
> his chronic PTSD symptoms.  However, the ALJ not only

dismissed that opinion but actually gave it no weight at
all because he found it inconsistent with the record as
a whole–again upon the unsound notion that Plaintiff was
actually able to participate and interact appropriately
with others during PTSD group therapy sessions.

(Pl.'s Br. at 7-8.)

The Commissioner responds that the ALJ properly complied with
the Regulations in evaluating the medical source opinions and the
VE identified a significant number of jobs that Claimant could
perform despite the limitations on social interaction and noise.
(Def.'s Br. at 13-16.)  Specifically, the Commissioner asserts:

Plaintiff contends that the ALJ did not give sufficient
weight to the opinion of Roslyn Feierstein, a
psychologist at the VE center, who examined Plaintiff
once, in August 2008, over three years after his
eligibility for DIB expired, in connection with his
request for VA compensation and a pension (Pl.'s br. at
7-8). However, Plaintiff disregards the Commissioner's
regulations...20 C.F.R. § 404.1527(d)(2)(2010).
Moreover, the regulations provide that a treating
source's opinion about a claimant's ability to work is
not entitled to any special significance to the source of
another opinion on this issue.  See 20 C.F.R. §
404.1527(e)(1).

Putting aside the question of whether psychologist
Feierstein, a one-time examining source, was a "treating
source" under the Commissioner's regulations, the facts
of this case demonstrate that even if she were a treating
source, her opinion is not entitled to controlling
weight.  The VA Progress note of Dr. Feierstein's
examination indicates that Plaintiff's "self report" was
relied upon for purposes of Dr. Feierstein's examination
(Tr. 277)...She opined that his chronic PTSD
symptomatology...rendered him "unemployable" (Tr. 288).
However, under the Commissioner's regulations, an award
of VA benefits is not dispositive of entitlement to
social security benefits.  See 20 C.F.R. § 404.1504...

Moreover, under the Commissioner's regulations for
evaluating medical source opinions, psychologist

Feierstein's opinion is not entitled to controlling
weight because it is inconsistent with the fact that
after Plaintiff's group therapy session for PTSD, Linda
Pennington, a clinical psychologist, reported on February
28, 2006, that he was "quiet but attentive to group
content and process.  He made appropriate contributions
to the group discussion.  There was no indication of
problems or conflicts related to the process of this
group.  Affect was appropriate" (Tr. 299).  On January
24, and 31, 2006, February 14, and 21, 2006, Robert
Huwieler, clinical psychologist, noted after conducting
the group sessions that Plaintiff was "appropriate in
group, attentive to group content and process, and
appeared to have no problems or conflicts related to the
focus or process of this group" (Tr. 299-302)...

Furthermore, the ALJ took Plaintiff's alleged avoidance
behavior into consideration to the extent that the ALJ,
in determining Plaintiff's residual functional capacity,
included a need to avoid more than incidental interaction
with the public and no close cooperation with coworkers
to achieve job tasks (Tr. 15).  The vocational expert
identified a significant number of jobs that exist in the
national economy that Plaintiff could perform despite the
limitations on social interaction and working in a noisy
environment due to hearing loss.  Therefore, at the fifth
step of the sequential evaluation process, the
Commissioner has met his burden of producing evidence
that work exists in the national economy that Plaintiff
could perform.

(Def.'s Br. at 13-16.)

Regarding the medical evidence from Dr. Feierstein, the ALJ

made these findings:

On August 20, 2008, Dr. Roslyn Feierstein, PhD, of the VA
Medical Center, opined that the claimant is unemployable
due to his chronic PTSD symptoms.  Dr. Feierstein noted
that the claimant was unable to work at any exertional
level as evidenced by multiple unsuccessful attempts.
Dr. Feierstein indicated that the claimant's past
employment allowed him to work alone and infrequent
interactions typically led to verbal altercations.  The
undersigned gives no weight to Dr. Feierstein's opinion
because it is inconsistent with the record as a whole.
In fact, the VA records demonstrate that the claimant was

27

able to participate and interact appropriately with others during the PTSD group therapy sessions (Exhibit 8F). The undersigned gives no weight to Dr. Feierstein's opinion because it is inconsistent with the record as a whole which was not available to Dr. Feierstein...

(Tr. at 19.)

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. § 404.1527(d)(2) (2005). Thus, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. § 404.1527(d)(2) (2005).

Under § 404.1527(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Section 404.1527(d)(3), (4), and (5) adds the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty).

Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." § 404.1527(d)(2).

Under § 404.1527(d)(1), more weight generally is given to an examiner than to a non-examiner.  Section 404.1527(d)(2) provides that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). The Fourth Circuit Court of Appeals has held that "a non-examining physician's opinion cannot by itself, serve as substantial evidence supporting a denial of disability benefits when it is contradicted by all of the other evidence in the record." Martin v. Secretary of Health, Education and Welfare, 492 F.2d 905, 908 (4th Cir. 1974); Hayes v. Gardener, 376 F.2d 517, 520-21 (4th Cir. 1967). Thus, the opinion "of a non-examining physician can be relied upon when it is consistent with the record." Smith v. Schweiker, 795 F.2d 343, 346 (4th Cir. 1986).

With respect to Claimant's argument that the ALJ failed to appropriately evaluate the medical source opinion of Dr. Feierstein, the court finds it to be without merit.  The ALJ complied with the Regulations and reasonably concluded that Dr. Feierstein's one-time examination report dated August 20, 2008 conflicted with the evidence of record as a whole.  It is further noted that the examination was conducted and the report written

29

nearly three years after Claimant's date last insured of December 31, 2005.   Also, it conflicts with previous VA psychological records indicating Claimant's ability to participate in a multi-session group therapy for PTSD. (Tr. at 277-88, 299-302.) Additionally, Dr. Feierstein states that her report was based on "[t]he Veteran's self-report" as "a reliable source of information for purposes of this examination" and does not indicate a review of Claimant's medical record. (Tr. at 277.)

Regarding the vocational expert's opinions, the ALJ made these findings:

> Through the date last insured, the claimant's ability to perform work at all exertional levels was compromised by nonexertional limitations.  The ALJ asked VE whether jobs existed in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity ["RFC"], including being limited to medium exertion.  The VE testified that given all of these factors the individual would have been able to perform the requirements of representative occupations such as cleaner (300,000 jobs exist nationally and 25,000 jobs exist regionally); hand packing (210,000 jobs exist nationally and 8,000 jobs exist regionally); night stocking (250,000 jobs exist nationally and 18,000 jobs exist regionally).  The VE described the jobs identified as medium exertion and unskilled.
>
> The undersigned finds that further review of the evidence reveals a limitation to medium exertion is unwarranted.  However, since the claimant has no exertional limitations, he can certainly perform the unskilled medium jobs identified by the VE.  Furthermore, pursuant to SSR-00-4p, the VE's testimony is consistent with the information contained in the Dictionary of Occupational Titles.
>
> The claimant's representative proposed the additional restriction of unable to maintain emotional stability and even leaves work site.  The VE indicated that this would

preclude the jobs listed.  The representative further
proposed the restriction of the individual stopped work
tasks.  The VE indicated that this would preclude the
jobs listed if done on a regular basis.  The undersigned
rejects the additional restriction proposed by the
representative because there are no objective findings in
the record to support such restrictions.  In fact, while
the claimant alleged he would stop working and leave his
job, nothing in the record supports his allegations.
Further, the claimant indicated that he was never fired
or disciplined for the alleged behavior.

(Tr. at 19-20.)

To be relevant or helpful, a vocational expert's opinion
must be based upon consideration of all evidence of record,
and it must be in response to a hypothetical question which
fairly sets out all of the claimant's impairments.  Walker v.
Bowen, 889 F.2d 47, 51 (4th Cir. 1989).  "[I]t is difficult to
see how a vocational expert can be of any assistance if he is
not familiar with the particular claimant's impairments and
abilities -- presumably, he must study the evidence of record
to reach the necessary level of familiarity."  Id. at 51.
Nevertheless, while questions posed to the vocational expert
must fairly set out all of claimant's impairments, the
questions need only reflect those impairments that are
supported by the record.  See Chrupcala v. Heckler, 829 F.2d
1269, 1276 (3d Cir. 1987).  Additionally, the hypothetical
question may omit non-severe impairments, but must include
those which the ALJ finds to be severe.  Benenate v.
Schweiker, 719 F.2d 291, 292 (8th Cir. 1983).

31

    With respect to Claimant's argument that the ALJ failed
to appreciate Claimant's representative's questions to the VE,
this assertion is without merit.    The ALJ's RFC finding
related to Claimant's impairments reflected Claimant's
limitations as supported by substantial evidence of record.
These limitations were included in several increasingly
restrictive hypothetical questions, and the vocational expert
concluded that Claimant could perform work.  (Tr. at 46-50.)
Claimant's representative had an opportunity to pose
additional hypothetical questions to the vocational expert,
and did so.  (Tr. at 50-51.)  The record clearly shows that
the ALJ was present and attentive during the re-examination of
the vocational expert.  Id.   The ALJ found that the VE
identified a significant number of jobs that Claimant could
perform despite the limitations on social interaction
(demonstrating that the ALJ took Claimant's "avoidance
behavior" into consideration) and noise, and that the record
did not support the Claimant's representative's additional
limitations to the hypothetical.  While questions posed to VE
must fairly set out all of claimant's impairments, the
questions need only reflect those impairments that are
supported by the record.

    After a careful consideration of the evidence of record,
the court finds that the Commissioner's decision is supported

by substantial evidence.   Accordingly, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this court.

The Clerk of this court is directed to transmit copies of this Order to all counsel of record.

ENTER: August 16, 2011

*Mary E. Stanley*
Mary E. Stanley
United States Magistrate Judge